United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 7, 2006**

Charles R. Fulbruge III
Clerk

REVISED JANUARY 9, 2007

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 04-50957

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDWARD EUGENE ROGERS,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

No. SA-04-CR-010

Before KING, STEWART, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Edward Eugene Rogers filed a motion to suppress evidence obtained as a result of a traffic

stop, asserting that his Fourth Amendment rights were violated because there was no reasonable

---

[*]Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

suspicion to believe that he violated traffic laws or was otherwise engaged in criminal activity. Rogers appeals from the denial of the motion to suppress.

The district court sentenced Rogers to a mandatory guidelines sentence of twelve months and one day to be followed by three years of supervised probation–a *Fanfan* error. The judgment includes an alternative sentence of five years probation if the federal sentencing guidelines did not apply. We affirm the denial of the motion to suppress, vacate Rogers's sentence, and remand to the district court for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Edward Eugene Rogers was charged by indictment with being a felon in possession of a firearm. He moved to suppress the firearms seized during the warrantless search of his vehicle, arguing in relevant part that the officers lacked reasonable suspicion for the traffic stop. The Government responded that the officers stopped Rogers's vehicle for violating Texas traffic laws after ATF agents alerted them that Rogers was a convicted felon in possession of a firearm. The following testimony of San Antonio, Texas, police officer Scott Arriaga was adduced at the hearing on the motion.

On December 6, 2003, Arriaga was contacted by ATF agent Chris Benavides, who was working a gun show with another agent. When asked what Benavides communicated to him in that call, Arriaga testified: "That they were watching a person who had purchased a handgun at a gun show. Apparently, he was a convicted felon, wasn't supposed to be purchasing the handgun at the time." Arriaga testified that he believed Benavides identified the individual as Edward Rogers and gave Arriaga a description of Rogers and the pickup truck in which Rogers left the gun show.

2

Benavides asked Arriaga and his partner, John Pagola, to develop a basis to stop Rogers' vehicle and, therefore, he and Pagola were on the look-out for a traffic violation.

Arriaga saw the truck leave the parking lot near the gun show and followed; Pagola drove the patrol car. Arriaga observed Rogers's truck pull into a convenience store located near the gun show. Arriaga further testified as follows: Arriaga did not know why he and Pagola were looking for a traffic violation. Benavides said he "observed someone purchas[e] a handgun, give it to [Rogers] and [Rogers] put[] it in his pocket," and saw Rogers get into the truck. According to Arriaga, that was sufficient for the officers to stop the truck. Nevertheless, it was not unusual for the patrol officers to be told to develop some kind of probable cause to stop a vehicle.

After Rogers left the convenience store, Pagola and Arriaga continued to follow in their squad car. The patrol officers initiated a traffic stop because they observed smoke coming out of the truck's exhaust and saw that there was no center rear-view mirror inside the truck.[1] As Arriaga approached the passenger side of the vehicle where Rogers's wife was seated, he observed a scope between the seats. Arriaga asked Rogers's wife to get out of the truck. As she did so, Arriaga saw a rifle underneath the back seat in the truck, in addition to the scope he had observed between the seats. Rogers stayed in the truck until ATF agents arrived.

At the close of the suppression hearing, the district court ordered supplemental briefs regarding the legality of the stop based on the Benavides's knowledge. The Government thereafter argued pursuant to the collective knowledge doctrine that (1) the ATF agents had both reasonable suspicion and probable cause to stop Rogers based on their observation of him purchasing a handgun

---

[1]As detailed in n.2, *infra*, whether there were actual traffic violations as a basis for this stop is not at issue in this appeal.

and their knowledge that he was a convicted felon and (2) Arriaga objectively relied on that information as communicated to him by Benavides and, therefore, the stop was legal. Rogers responded that the collective knowledge doctrine was inapplicable because there was no testimony adduced that the ATF agents knew that Rogers was a felon or that they communicated this fact to Arriaga. Rogers specifically contended that the Government had mischaracterized Arriaga's testimony that "*[a]pparently*, [Rogers] was a convicted felon" as an affirmative statement made to Arriaga by Benavides.

The district court denied the motion to suppress without reasons. Subsequently, Rogers entered a conditional plea of guilty, reserving the right to appeal the denial of the motion to suppress evidence obtained after a traffic stop of the vehicle he was driving. On September 10, 2004, the district court ordered Rogers imprisoned for a term of twelve months and one day.

Rogers appeals from the order denying his motion to suppress the evidence obtained due to of the traffic stop as fruit of a Fourth Amendment violation.

## II. STANDARD OF REVIEW

On appeal from the denial of a motion to suppress, we review conclusions of law de novo, including whether there was reasonable suspicion for the search; findings of fact are reviewed for clear error. *United States vs. Alvarez*, 451 F.3d 320, 329 (5th Cir. 2006); *United States v. Roberts*, 274 F.3d 1007, 1011 (5th Cir. 2001). Additionally, we "view[] the evidence 'in the light most favorable to the prevailing party.'" *Alvarez*, 451 F.3d at 329 (quoting *United States v. Gibbs*, 421 F.3d 352, 356-57 (5th Cir.2005)); *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000). "The denial should be upheld if there is any reasonable view of the evidence to support it." *Roberts*, 274 F.3d at 1011 (internal quotation marks omitted).

4

Although a warrantless seizure is "per se unreasonable unless [it] fall[s] within a few narrowly defined exceptions," *United States v. Kelly*, 302 F.3d 291, 293 (5th Cir. 2002), "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

## III. DISCUSSION

### A. Motion to Suppress

The government violates a defendant's Fourth Amendment rights by executing a search or seizure without probable cause. *Jones*, 234 F.3d at 239. A traffic stop is a seizure within the meaning of the Fourth Amendment. *Id.* "[T]he balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause in such cases, [therefore] the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Accordingly, *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, "[permit] law enforcement officers [to] briefly detain pedestrians and motorists in public, even without probable cause to arrest them," *Ibarra-Sanchez*, 199 F.3d at 758, if the officers have reasonable suspicion to believe "that the person stopped is, or is about to be, engaged in criminal activity," *United States v. Cortez*, 449 U.S. 411, 417, 421-22 (1981). *See also United States v. Brignoni-Ponce*, 422 U.S. 873, 878-82 (1975) ( "In both *Terry* and *Adams v. Williams*[,407 U.S. 143 (1972)] the investigating officers had reasonable grounds to believe that the suspects were armed and that they might be dangerous. The limited searches and seizures in those cases were a valid method of protecting the public and preventing crime."). When a warrantless

seizure is conducted, it is the government's burden justify the warrantless search or seizure. *Jones*, 234 F.3d at 239.

"Reasonable suspicion" is objectively reasonable, particularized, and articulable suspicion that a person has committed or is about to commit a crime. *Jones*, 234 F.3d at 239; *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also Terry*, 392 U.S. at 27 (noting that due weight must be given to the "specific reasonable inferences which [the law enforcement officer] is entitled to draw from the facts in light of his experience" but "not to his inchoate and unparticularized suspicion or 'hunch'" ). This means that, based upon the totality of the circumstances, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. *Cortez*, 449 U.S. at 417-18. Thus, reasonable suspicion is less than probable cause, yet more than a hunch or unparticularized suspicion. *Arvizu*, 534 U.S. at 274; *Terry*, 392 U.S. 27. "[W]here, as here, there is at least minimal communication between the different arms of the law, we look to the 'collective knowledge' of the law enforcement authorities" to determine whether there was reasonable suspicion to justify the traffic stop. *United States v. Vasquez*, 534 F.2d 1142, 1145 (5th Cir. 1976).

Rogers argues that the motion to suppress should have been granted because there was no reasonable suspicion of criminal activity to support this traffic stop. At the hearing, Arriaga testified that when he got the call to stop Rogers for a traffic violation, Agent Benavides was communicating "[t]hat they were watching a person who had purchased a handgun at a gun show. Apparently, he was a convicted felon, wasn't supposed to be purchasing the handgun at the time." Rogers contends that Arriaga assumed that Benavides requested the stop because "[a]pparently [Rogers] was a convicted

6

felon." Rogers maintains that the record does not indicate that Benavides had reasonable suspicion of criminal activity.

By contrast, the Government argues that even without a traffic violation, the officers properly stopped Rogers because Benavides's reasonable suspicion transferred to Arriaga via the collective knowledge doctrine. According to the Government, "[a]pparently [Rogers] was a convicted felon" simply meant that it was apparent to Arriaga from Benavides' statements that Rogers was a convicted felon.

Each argument is a reasonable inference from Arriaga's testimony. The district court denied the motion without reasons; there are no explicit findings of fact for the first tier of our review. From its framing of the issue for supplementary briefing, it appears the district court reasoned that if it were legally sufficient for Arriaga to base the stop on what the ATF agents had observed, then the issue whether Rogers had violated Texas traffic law was irrelevant. Although the district court did not make factual findings about what Benavides observed, knew, or communicated to Arriaga,[2] implicit in the district court's denial of the motion to suppress is its conclusion that in the totality of the circumstances, there was reasonable suspicion to support the stop of Rogers's van.

In support of its collective knowledge argument, the Government cites *United States v. Allison*, 616 F.2d 779 (5th Cir. 1980), where we upheld a district court's denial of a motion to

---

[2] Likewise, the district court did not make findings of fact attendant to the traffic violations. After assuming "as factually accurate" the facts supporting Rogers's argument that there was no traffic violation, the district court asked the Government to research the Texas traffic statutes and find out whether there was a requirement that Rogers's truck have an interior rear view mirror–perhaps in the inspection statutes–as part of its supplemental briefing. On appeal, the Government argues only that the traffic stop was permissible based on information supplied by Benavides, therefore we address the traffic violations only to note that the district court assumed as true certain facts and to note that at the close of the hearing, there had been no determination whether the assumed facts yielded the conclusion that the traffic stop was reasonable.

7

suppress that asserted lack of reasonable suspicion for a traffic stop. *United States v. Allison*, 616 F.2d 779 at 780, 782. There, a service station manager refused to accept a twenty dollar bill tendered by one of the occupants of a vehicle for gas because he suspected the money was counterfeit. The manager called the local sheriff's department and Police Chief Bernatovitz of a nearby police department responded to the complaint. The manager described the vehicle and its occupants to Chief Bernatovitz, who in turn relayed the description to Deputy Collier, the law enforcement officer who later made the traffic stop. *Id.* at 780. The *Allison* court held that based on the collective knowledge doctrine Collier had reasonable suspicion to make the traffic stop of a vehicle and person matching the description. *Allison* 616 F.2d at 781-82. The Government also relies on *United States v. Ibarra-Sanchez*, 199 F.3d 753, 756-57 (5th Cir. 1999), where we similarly upheld a traffic stop made by another law enforcement officer. There, a Drug Enforcement Administration agent testified about his observations during an investigation–personal observations that provided reasonable suspicion for another law enforcement officer to stop the van containing the defendants.

The *Allison* court rejected the argument that the traffic stop could not be based upon double hearsay because Collier neither had personal knowledge of the attempted passing of counterfeit money, nor received information from someone who had such personal knowledge. Nevertheless, *someone* presumably reliable had personally observed and relayed information sufficient to constitute reasonable suspicion for an investigative stop. Likewise, in *Ibarra-Sanchez*, the DEA agent had personally observed and communicated information indicating that he had reasonable suspicion to make a *Terry* stop. In these and other decisions upholding investigatory traffic stops based on the collective knowledge doctrine, it was required that someone reliable personally observe–and communicate–actions and/or events sufficient to constitute reasonable suspicion either alone or when

8

considered in the totality of the circumstances. *See Ibarra-Sanchez*, 199 F.3d 753; *see also Brignoni-Ponce*, 422 U.S. at 878, 882 (The Supreme Court was "unwilling to let the Border Patrol dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving-patrol stops" because "the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."); *Allison*, 616 F.2d 779; *Saldana v. United States*, 1985 WL 5997 (S.D. Tex. Nov. 7, 1985) (unpublished).

In the instant case, Benavides, a law enforcement officer observed the suspicious behavior and communicated directly with Arriaga, one of the detaining officers. Under the collective knowledge doctrine, if Benavides had the requisite reasonable suspicion to initiate a *Terry* stop, Pergola and Arriaga could initiate the traffic stop based on Benavides's reasonable suspicion. *Cf. Ibarra-Sanchez* 199 F.3d at 759 ("[I]f Mattas possessed sufficient reasonable suspicion to stop the van when he made his call to the dispatcher, then the actual stop by the [police] officers, acting on the dispatcher's bulletin, was also supported by reasonable suspicion."); *Allison* 616 F.2d at 782 ("Here, the information acted upon had been personally given by the manager of the service station to Chief Bernatovitz who in turn accurately transmitted the information to Deputy Collier."); *Saldana v. United States*, 1985 WL 5997, *6 (S.D. Tex. Nov. 7, 1985) (unpublished) ("declin[ing] to make a reverse application of the 'collective knowledge' concept" to impute officers' knowledge that there was no reasonable suspicion where there was no indication of communication between officers with such knowledge and the detaining officer).

The testimony is sparse on the question of what Benavides saw or knew. The district court found Arriaga to be a credible witness. Arriaga testified that Benavides saw someone purchase a gun

9

and give it to Rogers. Arriaga also testified that Benavides communicated Rogers's name in addition to the description. The district court's statements during the suppression hearing do not suggest that there were factual findings *whether* the motion to suppress testimony and other evidence revealed what Benavides saw Rogers do or what Benavides knew about Rogers's criminal history–or, if revealed, *what* Benavides saw or knew. Nevertheless, the ruling indicates that after supplemental briefing, the district court resolved disputed facts–such as whether Benavides knew Rogers was a convicted felon–in favor of the Government. Given the reasonable factual inferences that may be drawn from Arriaga's testimony, we cannot say that the district court erred in concluding that Benavides had reasonable suspicion imputable to Arriaga.

Buying a gun at a gun show is not suspicious activity, but based on an ATF agent's experience, training and observations, buying a gun and giving it to someone else could be deemed suspicious. Arriaga's testimony indicates that Benavides knew Rogers's name when he asked Pergola and Rogers to make the traffic stop. While it is true that Arriaga did not expressly testify that Benavides told him that Rogers was a convicted felon, that conclusion can nevertheless fairly be drawn from the record given that (1) Arriaga's statement was made in response to the question, "What was it that Agent Benavides was communicating to you when you got the call?" and (2) Benavides gave Arriaga Rogers' name and vehicle description, suggesting that the ATF agents had done some preliminary investigation–or otherwise had knowledge–of Rogers's identity.

Implicit in the district court's ruling is the district court's conclusion that under the totality of the circumstances, the Government carried its burden to show that Benavides had reasonable suspicion to stop and briefly detain Rogers. Viewing the evidence in the light most favorable to the

Government, Benavides had reasonable suspicion that Rogers was a convicted felon in possession of a handgun.

Considering the district court's statements at the suppression hearing and the factual inferences that reasonably may be drawn from Arriaga's testimony, and construing the evidence in the light most favorable to the Government, we find no reversible error in the district court's ruling. Under the totality of the circumstances, we cannot say that it was erroneous for the district court to conclude that the Government carried its burden to show that there was a reasonable suspicion supported by articulable facts that criminal activity was afoot.

B. Mandatory Guidelines Sentencing Error

The district court sentenced Rogers to twelve months and one day of imprisonment to be followed by three years of supervised release and, alternatively, to five years probation in the event that the federal sentencing guidelines are not binding and do not apply. In compliance with the plea agreement, Rogers did not challenge his sentence. Nevertheless, we ordered the parties to submit supplemental briefs on this issue. In response to our order and our questions during oral argument, the Government maintains that because Rogers waived his right to challenge his sentence, and because he agreed to be sentenced under the guidelines, *Booker* does not apply to this case. The Government further argues that the condition placed upon the alternative sentence requires that the sentencing guidelines be held unconstitutional in their entirety. According to the Government, *Booker* does not trigger the alternative sentence because guidelines still apply albeit in an advisory rather than mandatory capacity. In contrast, Rogers asserts that *Booker* triggered the alternative sentence because the mandatory sentencing guidelines no longer apply.

1. *Standard of Review*

11

Where plain error is apparent, the issue may be raised *sua sponte* by this court even though it is not assigned or specified." *United States v. Pineda-Ortuno*, 952 F.2d 98, 105 (5th Cir. 1992). A sentence imposed under mandatory federal sentencing guidelines is *Fanfan* error. *United States v. Reyes-Celestino*, 443 F.3d 451, 453 (5th Cir. 2006) (describing argument that district court erred by sentencing under mandatory guidelines to be "properly characterized as a *Fanfan* claim"); *United States v. Mendoza-Sanchez*, ___ F.3d ___, 2006 WL 1966655, (5th Cir. Jul 14, 2006). *Fanfan* error is plain error that may or may not be harmless. Where "the district court, *sua sponte*, addresse[s] the issue of the effect of *Blakely v. Washington*, 542 U.S. 296 (2004), on the sentencing guidelines, we review the district court's "*Fanfan*" error under the harmless error standard of review." *United States v. Archundia*, 2006 WL 1519698, *1 (5th Cir. May 30, 2006) (unpublished).

2. *Analysis*

In *United States v. Mares*, 402 F.3d 511, 520 n.9 (5th Cir. 2005), we noted that if "the issue presented in *Fanfan* is preserved in the district court *by an objection*, we will ordinarily vacate the sentence and remand, unless we can say the error is harmless under Rule 52(a) of the Federal Rules of Criminal Procedure." *United States v. Mares*, 402 F.3d 511, 520 n.9 (emphasis supplied). In *United States v. Rodriguez*, 15 F.3d 408, 414 (5th Cir.1994) this court "not[ed] that the purpose of an objection is to bring an issue to the attention of the district court so that it may correct itself and thus, obviate the need for this court's review." *Archundia*, 2006 WL 1519698 at *1 (alteration and internal quotation marks citation omitted).

This a unique factual scenario presenting on appeal a plain error that was preserved when the district court took note of the possibility that *Blakely* and its progeny would render inapplicable the then-mandatory federal sentencing guidelines. *Cf. Archundia*, 2006 WL 1519698 at *1 (error

12

preserved *sua sponte* by district court); *Mares*, 402 F.3d at 520 (reviewing for plain error where the defendant "did not object on this basis"). The aspect we find unique about the narrow circumstances of this appeal is that harmless error analysis applies when the error was preserved in the district court, while usually our plain error review reveals errors that were not preserved and that are therefore subject to plain error analysis. *Cf.* Mendoza-Sanchez, 2006 WL 1966655 at *3-4; *Reyes-Celestino*, 443 F.3d at 453 ("This court reviews perserved *Fanfan* claims for harmless error."). Because this court determines its standard of review, we are not constrained to apply plain error analysis where the error is preserved in the court below.

The only question we ask when we review for harmless error is "whether the government has met its burden to show harmless error beyond a reasonable doubt in the imposition of the defendant's sentence." *Reyes-Celestino*, 443 F.3d at 453 (alteration and internal quotation marks omitted).

Rogers' twelve month one day sentence was imposed under mandatory guidelines. The alternative sentence included in the judgment leaves no doubt that the district court would have imposed a lesser term of imprisonment but for the then-mandatory nature of the guidelines, therefore this error cannot be harmless. The Government made the only arguments that arguably could remove its impossible burden to prove this *Fanfan* error was harmless. We reject the Government's argument that Rogers's waiver of the right to appeal his sentence precludes our review of the sentence.

"[B]ecause we must construe all ambiguities in the plea agreement against the government, we cannot say that [Rogers] unambiguously agreed to a mandatory application of the Sentencing Guidelines." *Reyes-Celestino*, 443 F.3d at 453; *see also United States v. Garcia-Gomez*, 2006 WL 2022521 *1 (5th Cir. July 18, 2006) (unpublished) (observing that such a waiver provision "is construed against the Government as the drafter of the plea agreement"); *United States v. Somner*,

13

127 F.3d 405, 408 (5th Cir. 1997) ("The waiver must be construed against the government."). The

paragraph waiving the right to appeal this sentence reads in pertinent part as follows (emphasis

supplied):

> [Rogers] is aware that his sentence *will be imposed in conformity with the Federal Sentencing Guidelines and Policy Statements* which may be up to the maximum allowed by statute for his offense. . . . By entering into this agreement, and as a term of this agreement, [Rogers] voluntarily and knowingly waives the right to appeal his sentence on any ground, including any appeal right conferred by 18 U.S.C. § 3742; provided, however, that this waiver does not extend to his right to appeal any upward departure pursuant to U.S.S.G. § 5K2.0 from the Guideline range found by the District Court.

As in *Garcia-Gomez*, the instant plea agreement does not specifically waive Rogers's right

to be sentenced under advisory guidelines and, therefore, does not preclude our consideration of this

*Fanfan* error. *See Garcia-Gomez*, 2006 WL 2022521 at *1 (Where the "plea agreement does not

specifically waive the right to attack the constitutionality of § 1326(b), we conclude that the waiver

provision does not preclude this appeal."). For the same reason, we also reject the Government's

argument that the alternative sentence would be triggered only if the guidelines were found

unconstitutional in their entirety.

Rogers waived his right to appeal his sentence "on any ground" but his waiver was based on

the understanding that the sentence would be imposed "in conformity with" then-mandatory

sentencing guidelines. The waiver provision uses the words "on any ground"–words that arguably

include waiver of the right to be sentenced under advisory guidelines. Nevertheless, because this

waiver is grounded in Rogers's awareness that the sentence would conform to then-mandatory

guidelines. We read the plea agreement as having no explicit waiver of Rogers's right to be sentenced

under advisory guidelines. *See United States v. Reyes-Celestino*, 443 F.3d at 453 (noting that

"although Reyes agreed to be sentenced under the Sentencing Guidelines, he did not explicitly waive his right to challenge the constitutionality of the Guidelines on appeal."). "We cannot say that the [district] court[, the Government, or Rogers] contemplated an advisory guidelines system under which [the district] court was required to consider the advisory guideline range as one factor among others listed in 18 U.S.C. § 3553(a)." *United States v. Adair*, 436 F.3d 520, 529 (5th Cir. 2006) (internal quotation marks omitted) (quoting *United States v. Porter*, 417 F.3d 914, 917-18 (8th Cir. 2005)). Pursuant to Federal Rule of Criminal Procedure 52(a) and the jurisprudence of this circuit, we remand the case for the district court to determine Rogers's sentence under the advisory federal sentencing guidelines and applicable sentencing factors. *See Adair*, 436 F.3d at 527-29 and cases cited therein.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court ruling denying Rogers motion to suppress, VACATE the sentence and REMAND the case to the district court for resentencing.